**FORT WORTH LLOYDS INSURANCE COMPANY, Appellant,**

v.

**Louis Earl WILLHAM et ux., Appellees.**

**No. 7616.**

Court of Civil Appeals of Texas.

Amarillo.

June 6, 1966.

Rehearing Denied Sept. 6, 1966.

———◆———

Crenshaw, Dupree & Milam, Lubbock, Cecil Kuhne, Lubbock, of counsel, for appellant.

Key, Carr & Clark, Lubbock, Aubrey J. Fouts, Lubbock, of counsel, for appellees.

CHAPMAN, Justice.

This is an appeal from a judgment based upon a jury verdict for insureds, Louis Earl Willham, et ux., against Fort Worth Lloyds Insurance Company in a suit upon an insurance policy covering a vacant residence owned by appellees Willham in Lubbock. The damages awarded resulted from water leakage throught burst water pipes in the attic connected with the hot water circulating system of the residence. The discovery of the flooded house was made on December 21, 1964. The week previous the temperature in Lubbock had been down to 12° or 14° above zero.

Appellees had moved out of the state, placed their home on the market and listed it for sale with a real estate agent. They left one key with the agent and one with her brother-in-law and sister, Mr. and Mrs. Robert Mampel, so they could check on the place during the time it was vacant.

The house was centrally heated by gas. They had that service and the telephone service terminated. The water and electricity were left on for the convenience of the real estate agents showing the house to prospective purchasers. The agency with which it was first listed did not sell the place within three months, so it was then listed with Pat Garrett, another real estate agent. He suggested to the owners it might expedite the sale if the house was painted, so their real estate agent, with appellees' permission, employed painters to paint the house.

In July Mr. Mampel noticed water leaking from the water-evaporated air conditioner mounted on a stand outside of the house. He repaired the tubing. Approximately two weeks later he went back and found the plastic line had been pulled loose. At that time he cut the water supply to the house off at a valve in the back yard, then went into the house and opened the faucets in the kitchen and two bathrooms and flushed the water out of the commode.

In August Mr. Mampel went back after a gardener had mowed the lawn and discovered the water supply to the house had been cut on. He cut it off and went back through the same procedure inside and outside the house again. In October or early November he went back and checked on the house again and primarily checked to see that the water supply to the house was off and the faucet open in the kitchen. It was a dual type faucet that turned on both the hot and cold water by pushing the lever upward. The water supply to the house was off and the kitchen faucet open.

Mr. Mampel testified that about 5:30 or 6:00 o'clock p. m., December 21, his 17-year-old son while driving by the subject house saw two men " * * * in there—by their front door, and he stopped to see what was going on, and he looked in and—he didn't know the men, who they were, but he looked in the hallway, the entrance hall, was flooded—he came home and reported to us

that there was water all over the Willham's home * * *."

Don Anderson, foreman of a plumbing company and with twenty years experience as a plumber, repaired the burst pipes in the attic. He testified that cutting off the stop and waste valve outside the house drained the cold water out of the house and opening any two faucets inside the house drains the hot water circulating system. He said opening one faucet probably would drain the hot water but there is a possibility of an air lock. He said opening a valve at the water heater probably would not drain the hot water system as well as if the faucets in the house were open. He said the circulating system held about two or three gallons of water and the probability was if the water was cut off outside and the circulating system froze with one faucet open the pipes would not burst and no damage would be done. He testified in effect that in his opinion the water was on to the house when the freeze took place or there could not have been the extensive flooding of the house and as much damage. The policy of insurance in question under Section II, Subsection A of "Exclusions" contained an exclusion clause providing:

"Exclusions: This policy does not insure against—

A. Loss to either plumbing or heating systems including appliances, or by leakage or overflow from such systems or appliances, caused by freezing while the described building(s) is vacant or unoccupied, *unless the insured shall have exercised due diligence with respect to maintaining heat in the building(s) or unless such systems and appliances had been drained and the water supply shut off.*" (Emphasis added.)

Another very material condition to this law suit shown under Subsection A of Section VI "Other Provisions" which we shall call the "Prejudiced" clause in the policy provides:

"Other Provisions:

A. Control of Property: This insurance shall not be prejudiced by any act or neglect of any person (other than the named insured) *when such act or neglect is not within the control of the named insured."* (Emphasis added.)

The jury found (1) the water supply to the house had been shut off prior to the time the pipe froze and burst; (2) that the water system had been drained prior to the time the pipe froze and burst; and (3) that the water supply was not turned on prior to the loss by anyone under appellees' control.

Under the Exclusions A clause above quoted we need not give any consideration to that part concerning diligence with respect to maintaining heat in the building. It is admitted by appellees that they had the heat shut off. However, the word "or" used in the disjunctive separates that clause from the one providing "unless such systems and appliances had been drained and the water supply shut off."

If we understand appellant's complaint concerning the clause with respect to the drainage of the systems and appliances and shutting off the water supply, it is that the court committed reversible error in denying an instructed verdict for the reason " * * * there is no evidence that the plumbing system was drained and the water supply shut off at the time of the loss by leakage caused by freezing, as provided by the exclusion."

█ We are unable to agree with appellant's contention in this respect. The policy does not insure against loss unless such systems and appliances *had been drained and the water supply shut off.* (Emphasis added.) The clause is in the past tense. There is probative evidence from which the jury could and did find that the water supply to the house had been shut off and the systems and appliances drained prior to the time the pipe burst. The general rule of construction of such insurance poli-

cies has been stated by the Supreme Court of Texas in Providence Washington Insurance Company v. Proffitt, 150 Tex. 207, 239 S.W.2d 379, as follows:

"It is a settled rule in this state that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer. * * * It is also well settled that exceptions and words of limitation will be strictly construed against the insurer."

■ Applying the rules of law just quoted to the facts above related, we are compelled to the conclusion that the evidence supports the findings of the jury upon the first two issues submitted. To follow appellant's theory would be to hold the exceptions to the exclusions under discussion as surplusage and meaningless. Had the water supply been shut off and the appliances drained at the time of the freeze, there could have been no freezing of water in the pipes and therefore could never have been a loss if the exclusion requires that the water supply be shut off and the pipes drained at the particular time of the freeze.

■ "Insurance policies being contracts, they are governed by the rules of interpretation that are applicable to contracts generally, * * *." 32 T.J.2d, Insurance, Sec. 54, p. 102 and cases cited in the footnote under such statement.

■ The courts are without authority to needlessly reject any words or terms used in contracts by the parties or delete any clause therein as surplusage, unless such action is judicially mandatory. Williams v. J. & C. Royalty Co., Tex.Civ.App., 254 S.W.2d 178 (writ ref.) and cases there cited. We therefore hold that issues one and two should have been submitted to the jury; that there was probative evidence to support them; and that the verdict as to those issues was not against the great weight and preponderance of the evidence. It is immaterial that the brother-in-law was the one who terminated the water supply to the house and drained the systems and appliances. He was carrying a key to the house and we think it must be said that he was acting as appellees' agent insofar as his actions in respect to the water drainage of the house. He testified in effect that they left him the key in order that he might check on the house for them. It is difficult to conceive of a more important area to check than to see that the water supply was cut off and the pipes drained in a city where the temperature goes as low as 18° to 20° below freezing. This is especially true in a hot water circulating system such as appellees' house, where the water circulated from the hot water heater up through the attic and then back down into the hot water container and where the agent knew there was no heat in the house.

The record with respect to the third issue presents a more difficult problem. None of the parties have cited us to any authorities construing a clause such as the "Prejudiced" clause of Section VI under "Other Provisions" of the policy upon which Special Issue 3 was based or any clause analogous thereto. In our independent research we have been unable to find any case construing such clause.

■ Appellees contend by brief they were not required to prove that the one turning the water back on was not under their control. We do not so interpret the policy. The clause under consideration is just as much a part of the contract as the exclusions clause, and we believe when considered in connection therewith requires a showing under this record that the one turning the water back on was not within the control of appellees. There being no direct evidence, we must look to the circumstances. We hold such circumstances are such as required the trial court to submit the issue but we believe the answer of the jury is contrary to the great weight and preponderance of the evidence.

On passing on this question we must weigh and consider the evidence which supports the verdict and that which does not, and must set aside the judgment and remand the case if after such consideration we conclude the verdict is so contrary to the overwhelming weight of all the evidence as to be manifestly unjust, regardless of whether there is some evidence to support it. Watson v. Prewitt, 159 Tex. 305, 320 S.W.2d 815; In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

One of the keys to the house at the time was under the control of the real estate agent, Pat Garrett. The record shows there was a lock box on the door for the benefit of all real estate agents in multiple listing and on which a master key worked. The house was in the multiple listing service, as we understand the record. This means that all real estate agents in Lubbock in multiple listing had a master key to open the box on the door containing the key to the house, " * * * where any of them can come by and show the house."

The real estate agent with appellees' consent also employed painters who had been working inside the house shortly before the pipes burst. We thus have the painters, Mr. Garrett, and all other multiple listing real estate agents with access to the house and premises. We believe the jury had the right under the circumstances to pass on the question of whether some of these people turned the water back on. Still, appellees would not be prejudiced within the clause under discussion unless within the terms of the policy they exercised control over all these people within the terms of the "Prejudiced" clause of Section VI. under "Other Provisions." We believe it must be said that they at least exercised control through their agent of the workmen who had been painting the house. Since they were employed by the real estate listing agent with the consent of appellees, they certainly had the authority to control them through their agent, even to the extent of requiring that they not turn the water on in the house had they desired to make such condition in the painting agreement. Furthermore, we think it most improbable that painters would work the customary eight hour day without turning the water on in the house for either the use of the commodes, the lavatories, for drinking purposes, or for inside paint mixture without instructions not to do so, or not to cut it on without cutting it back off.

In a case construing an automobile liability policy the Supreme Court of Texas in American Fidelity & Cas. Co. v. Traders & Gen. Ins. Co., 160 Tex. 554, 334 S.W.2d 772, 775 has said:

> "Black's Law Dictionary (4th Ed., 1951) defines 'control' as 'Power or authority to manage, direct, govern, administer, or oversee.' In State v. Camper, Tex.Civ.App., 261 S.W.2d 465, 468, it is stated that 'control' is 'synonymous with management.'"

The word "control", citing Webster's New International Dictionary and Words and Phrases, has been defined in Board of Insurance Commissioners v. Duncan, Tex. Civ.App., 174 S.W.2d 326, 329, (writ ref.) as follows:

> "'To exercise restraint or deciding influence over; to dominate; regulate; to hold from action; to curb; subject or overpower.' Words and Phrases, Perm.Ed., vol. 9, page 434, says: 'To "control" means to exercise restraint or deciding influence over; to dominate; regulate; to hold from action; to curb; subject or overpower.'"

Neither of these definitions do violence to, but to the contrary, we believe, support our holding that under the "Prejudiced" clause appellees through their listing agent exercised control, or had the authority to exercise control over the painters with respect to turning the water on in the house, and were therefore within the control of the insureds.

The only testimony that others were in or around the house after the water was turned off last was the evidence concerning the two men observed by Mr. Mampel's son on the day he discovered the flooded house, and that testimony is not even perfectly clear as to whether they were the painters or not or were inside or outside the house.

If we are correct in our construction of the word "control" as it relates to the "Prejudiced" clause, to the effect that the insureds were obligated under the record to negative the fact that whoever turned the water back on was not within their control, then the judgment rendered is contrary to the great weight and preponderance of the evidence. Surely, if the painters did not turn the water back on, appellees could have proved the fact. We feel the case needs further development to insure justice to all the parties.

Accordingly, the judgment is reversed and remanded for a new trial.