TECHNICAL CONSULTANT SERVIC-
ES, INC., and Dr. I.H. Rubaii,
Plaintiffs–Appellees,

v.

LAKEWOOD PIPE OF TEXAS, INC.,
Defendant–Appellant.

No. 87–2947.

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1988.

Rehearing Denied Jan. 19, 1989.

Donald M. Hunt, Aubrey J. Fouts, Carr, Evans, Fouts & Hunt, Lubbock, Tex., for defendant-appellant.

John R. Ferguson, Elaine R. Lubin, Swidler & Berlin, Washington, D.C., for plaintiffs-appellees.

Before GOLDBERG, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Lakewood Pipe of Texas, challenges the judgment entered against it on a jury finding that it breached a contract to guarantee commissions appellee Technical Consultant Services earned in arranging a sale in Iraq. We affirm that portion of the judgment predicated on the jury's finding that Lakewood breached its contract.

However, we remand to permit the district court to recompute prejudgment interest due on the award.

## I.

This dispute arose from a $1.3 million sale of irrigation pipe to Iraq in 1975. The sale's genesis dates to spring 1974, when representatives of Federal Supply, Inc., a Florida-based distributor of plastic irrigation equipment for lawns and golf courses, met Dr. I.H. Rubaii at a trade show. Rubaii, a naturalized American citizen born in Iraq, sought to promote trade between America and oil-rich Iraq through his company, Technical Consultant Services, Inc. (TCS). Rubaii's primary business contact in Iraq was his brother, Abdul Al–Rubaii, an attorney, banker and businessman who ran his own consulting firm in Baghdad called the Arab Bureau.

After several months of informal dealings, during which Rubaii obtained bid specifications for Iraqi government projects through the Arab Bureau and passed them on to Federal, Rubaii signed an agency contract with Federal on September 12, 1974. Rubaii agreed to establish contracts for Federal in return for ten percent of each contract's face value and fifty percent of Federal's gross profit on each contract. Around this time, Rubaii supplied a bid specification for metal irrigation pipe from the Iraqi Ground Water Administration. Federal thought this contract matched its expertise closely enough to make pursuit worthwhile.

Rubaii, the Arab Bureau and Federal spent the next several weeks pursuing the Iraqi irrigation contract together. Rubaii and the Arab Bureau provided visas for Federal's officers; wrote a letter of introduction; and set up an appointment with the Ground Water Administration's chief engineer. Federal's president and vice president spent fourteen days in Iraq in November 1974 but were unable to obtain a signed contract. At trial, Federal's vice president described the trip as a failure; Rubaii described it as the first step toward consummating the contract, before which

Federal and Iraqi officials needed to iron out technical differences over the pipe.

Relations between Federal and Rubaii cooled after the first trip. Although Rubaii continued to send inquiries and information about the pipe contract to Federal during December 1974 and January 1975, Federal had stopped communicating with Rubaii by mid-December. Federal, however, continued to pursue a pipe contract with the Iraqi officials. In early December, Federal contacted Lakewood Pipe of Texas, a pipe supplier based in Lubbock, Texas, for price quotations. These were finalized by December 19, 1974.

Federal asserted that in mid-January it received an unsolicited call from Mohammed Hammoud, a commercial broker based in Beirut, who offered to set up a separate pipe deal with Iraq. Rubaii claims that during December 1974 and January 1975, Federal and the Iraqis merely worked out technical and pricing differences involving the same contract they had discussed in November. In any event, Federal's vice president made a second trip to Iraq in mid-January; Federal and the Iraqi Ground Water Administration signed a $1,357,912.70 contract for the sale of irrigation pipe on January 29, 1975.

Federal's financial situation had deteriorated steadily during its pursuit of an Iraqi supply contract. Unable to put up a performance bond—or, according to Federal, pay Hammoud's fee—Federal asked Lakewood on January 20, 1975, to provide letters of credit for these obligations in return for Federal's promise to place its pipe order with Lakewood. Lakewood agreed and the deal was sealed. Federal and Lakewood formalized their arrangement in an "Agreement and Assignment" dated February 8, 1975, under which Federal assigned Iraq's $1.3 million letter of credit to Lakewood and Lakewood guaranteed Federal's performance, expenses and obligations in connection with the pipe contract.

In April 1975, Lakewood sent $35,000 to Federal as "an advance against profit." Federal's vice president testified that Federal's president told Lakewood the money was for payment of an unnamed agent in Florida. When Federal made no move to ship the pipe to Iraq after Lakewood delivered it in June 1975, Lakewood assumed performance of the January 29, 1975 contract, shipped the pipe to Iraq, and collected Iraq's payment. Lakewood remitted nothing further to Federal, claiming that shipping and other expenses had consumed the entire difference between Iraq's letter of credit and Lakewood's own $1 million bill for supplying the pipe. Federal ultimately went bankrupt in early 1976.

Rubaii badgered Federal unsuccessfully throughout 1975 to pay him a commission on the Iraqi pipe sale, and later pursued claims in bankruptcy court. Rubaii first learned of Lakewood and the guaranty contract when he met with Lakewood officials, ostensibly on unrelated business, in March 1976. He then sought payment of Federal's commission from Lakewood under the February 8, 1975 guaranty contract. Rubaii sued Lakewood for payment of the commission in Florida state court on April 5, 1979.

The parties tried the case to a federal jury in the Southern District of Texas in March 1987. The jury found that (1) Rubaii performed his obligations under the Federal–Rubaii brokerage contract in arranging the Iraqi pipe sale; (2) Rubaii was a third party beneficiary under the Federal–Lakewood guaranty contract; and (3) Lakewood owed Rubaii $135,791.27 for his ten percent commission. The district court held that the Federal–Rubaii brokerage contract entitled Rubaii to attorney's fees and eighteen percent annual prejudgment interest dating to September 23, 1975, for a total recovery of $587,066.24.

## II.

### A.

In its initial attack, Lakewood argues that the statute of limitations bars Rubaii's claim. Under the Federal–Rubaii brokerage contract, Rubaii's cause of action accrued September 23, 1975. Rubaii filed the present suit in the Southern District of Texas in 1983—long after Texas' four-year

statute of limitations ran. However, we affirm the district court's conclusion that the Texas "wrong court" saving statute, which stops the clock for parties who file unintentionally in a court without jurisdiction, defeats Lakewood's statute of limitations defense.

This case owes much of its thirteen-year lifespan to a dispute about Florida courts' personal jurisdiction over Lakewood, a Texas corporation. Rubaii—whose TCS corporation is based in Florida, as was Federal—has filed three suits against Lakewood. He filed the first in April 1979 in Florida state court. A Florida appellate court affirmed dismissal for lack of personal jurisdiction over Lakewood in December 1979. However, the appellate court permitted Rubaii to submit supplemental proof of jurisdiction; it affirmed dismissal on appeal after remand in January 1981.

Rubaii filed his second suit on August 8, 1980, in U.S. District Court in Florida. On February 14, 1983, the Eleventh Circuit upheld dismissal of this suit for lack of personal jurisdiction. The Eleventh Circuit treated the state court's jurisdictional ruling on Rubaii's contract claims as res judicata. The court also dismissed Rubaii's newly raised tort claims for lack of personal jurisdiction over Lakewood. On February 17, 1983, Rubaii filed his third suit, now on appeal to us, in the Southern District of Texas.

To avoid the statute of limitations bar, Rubaii must show that his delay comes under the Texas saving statute. Tex.Rev. Civ.Stat.Ann. art. 5539a (Vernon 1958), which was in effect when the trial court ruled on this issue, provides:

> When an action shall be dismissed in any way ... because of a want of jurisdiction of the Trial Court ... and within sixty (60) days after such dismissal or other disposition becomes final, such action shall be commenced in a Court of Proper Jurisdiction, the period between the date of first filing and that of commencement in the second court shall not be counted as a part of the period of limitation unless ... the first filing [was] in intentional disregard of jurisdiction.

Lakewood argues that 5539a does not apply because Rubaii filed his second suit in a court of improper jurisdiction, the Middle District of Florida. We know of no Texas cases that have resolved the application of 5539a to a trilogy of suits such as this. Lakewood points to several opinions—none from Texas or the Fifth Circuit—involving other saving statutes for the proposition that plaintiffs get only one extra chance to file.

However, in resolving other 5539a questions the Texas courts and Fifth Circuit generally have stressed that the provision's remedial nature requires liberal construction. *See Griffen v. Big Spring Indep. School Dist.,* 706 F.2d 645, 651 (5th Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983); *Republic National Bank v. Rogers,* 575 S.W.2d 643, 647 (Tex. Civ.App.—Waco 1978, writ ref'd n.r.e.); *Burford v. Sun Oil Co.,* 186 S.W.2d 306, 310 (Tex.Civ.App.—Austin 1944, writ ref'd w.m.). "[5539a] should therefore be given a liberal construction with a view of effectuating its manifest objective—relief from penalty of limitation bar to one who has mistakenly brought his action 'in the wrong court.'" *Burford,* 186 S.W.2d at 310. *But cf. Rigo Mfg. Co. v. Thomas,* 458 S.W.2d 180, 182 (Tex.1970) (court refused to suspend statute of limitations for plaintiffs whose invalid service by mail failed to "commence" second suit within sixty days).

Thus, in *Griffen* this court applied 5539a to stop the clock for a plaintiff who (1) started out in a trial court of proper jurisdiction but failed to file a statutorily required motion for rehearing with a state administrative agency; and (2) brought two actions—one for review of a state administrative decision, the other for violation of federal civil rights statutes—based on the same facts. *Griffen,* 706 F.2d at 651–52. In applying 5539a to a case involving two actions, the Fifth Circuit necessarily stretched somewhat the statute's "*such* action shall be brought" language. To do otherwise, the court noted, would emphasize form over substance. *Id.* at 652.

The court in *Griffen* stressed that its result violated no policies underlying the

statute of limitations—such as avoiding prejudice from lost evidence and faded memories—because Griffen's opponent had ample notice that Griffen intended to pursue his claim. " 'Given the extremely high probability that the plaintiff will refile in a proper court ... the defendant has no one but himself to blame if evidence is lost, memories fade, and witnesses disappear.' " *Id.* at 650, (quoting *Long Island Trust Co. v. Dicker*, 659 F.2d 641, 647 (5th Cir.1981)). The *Griffen* court also quoted 5539a's caption, which identified it as "An Act to extend the period of limitation because of filing of *any action* in the wrong court...." *Griffen*, 706 F.2d at 651 (emphasis added).

▪ Similarly, Lakewood has defended this case actively from the start. Although four years passed between the filings in Florida state court and the Southern District of Texas, Lakewood cannot claim that Rubaii surprised it with this claim. The Texas courts' willingness to read 5539a broadly in light of its remedial goals justifies interpreting the provision to permit good faith refiling of a "subsequent" suit, not just a "second" suit.

This reading also responds to Lakewood's second argument that 5539a suspends limitations only between the dates of first and second filing. For reasons stated above, we interpret the statute as stopping the clock between a second filing and a subsequent one. We note that 5539a's good faith filing requirement will prevent parties from abusing the provision with an unending string of unjustifiable wrong-court filings.

▪ Lakewood also attacks the district court's grant of a directed verdict in Rubaii's favor on the issue of intentional disregard of jurisdiction.[1] The district court did not err in granting the motion because Lakewood presented insufficient evidence on this issue to require jury resolution. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969).

Lakewood argues that Rubaii intentionally disregarded jurisdiction by filing suit in the Middle District of Florida after the Florida state appellate court found insufficient contacts to establish personal jurisdiction over Lakewood. However, the state appellate court allowed Rubaii to present supplemental proof of jurisdiction on remand. Rubaii filed his second suit in the Middle District of Florida on August 8, 1980; the Florida appellate court did not affirm dismissal of the first suit after remand until January 14, 1981. Thus, there was no conclusive ruling for Rubaii to disregard when he filed his suit in federal court in August 1980.

Lakewood points to Rubaii's pretrial deposition testimony, in which he said that "the appeal judge" told him to file in Texas. Tr. at 696. At trial, Lakewood asked Rubaii if the state appellate judges had told him to file in Texas before he filed in the Middle District of Florida; Rubaii responded that he was referring to the U.S. Court of Appeals for the Eleventh Circuit. This vague reference provides too little evidence to disturb the district court's directed verdict.

Moreover, Rubaii's state court suit had alleged only contract causes of action; in contrast, the second suit added tort claims to his contract action. *Rubaii v. Lakewood Pipe of Texas, Inc.*, 695 F.2d 541, 543 (11th Cir.1983). The Eleventh Circuit looked only to Rubaii's contract claims when it concluded that the state court's jurisdictional decision established res judicata. *Id.* As for his tort claims, Rubaii argued that Florida's long-arm statute established personal jurisdiction over Lakewood in the Middle District of Florida because (1) a Lakewood executive met with Federal in Florida and stayed overnight; (2) Federal and Lakewood corresponded frequently; and (3) Lakewood paid $35,000 to Federal.

The Eleventh Circuit concluded that these contacts failed to establish personal jurisdiction for Rubaii's tort suit under the standards of *International Shoe Co. v.*

---

1. The saving statute by its own terms has no application if the "first filing [was] in intention-al disregard of jurisdiction." Tex.Rev.Civ.Stat. Ann. art. 5539a (Vernon 1958).

*Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed 95 (1945), and *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). *Rubaii,* 695 F.2d at 544. Although Rubaii did not establish personal jurisdiction for his tort claims based on these contacts, we cannot say that his position in the Middle District of Florida and the Eleventh Circuit amounts to intentional disregard of jurisdiction.[2] Therefore, 5539a operates to save Rubaii's suit from Lakewood's statute of limitation defense.

### B.

Turning to the merits, Lakewood attacks the jury's finding that Rubaii was a third party beneficiary of the February 8, 1975 guaranty contract between Lakewood and Federal. We reject Lakewood's argument that, as a matter of law, the guaranty established no third party beneficiary status for Rubaii. We also reject its contention that insufficient evidence supports the jury's finding.

Under Texas law, interpretation of an unambiguous contract is a question of law. *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 196 (Tex.1962). A contract is unambiguous when it is reasonably open to just one interpretation given the rules of construction and the surrounding circumstances. *Richland Plantation Co. v. Justiss–Mears Oil Co., Inc.,* 671 F.2d 154, 156 (5th Cir. 1982). The court here properly submitted the ambiguous guaranty contract between Federal and Lakewood to the jury.

In a recital, Lakewood agrees "to guarantee brokerage commissions due in connection with the performance of the obligations of Federal *incurred in connection with*" the January 29, 1975 pipe contract between Federal and Iraq. In clause 1(b), Federal assigns to Lakewood as much of Iraq's $1.3 million payment as necessary to pay Lakewood "for all expenses and obligations *incurred* by it for brokerage com-

missions ... *in connection with* the performance of the obligations of Federal in the transactions..." (emphasis added).

Lakewood argues that the guaranty's language and circumstances establish an intent by (1) Federal to protect Lakewood by assigning the Iraqi payment to it; and (2) Lakewood to guarantee only those brokerage commissions that Federal incurred "in the performance" of the Federal–Iraq contract—in other words, the commissions Hammoud supposedly earned by setting up the second trip to Iraq. But this cramped reading does not exhaust the possible interpretations. The guaranty's broad "incurred in connection with" language easily encompasses whatever commissions Federal became obligated to pay Rubaii for arranging negotiations with the Iraqis, even if Lakewood and Federal never mentioned Rubaii or TCS by name.

This reading makes sense under the surrounding circumstances as well. Lakewood's story of parallel pipe contracts was especially shaky given that the bid identification number and specifications contained in a series of communications from Rubaii to Federal—all of which were dated at least twenty-five days before the date when Hammoud supposedly delivered his alternate bid specifications to Federal— matched the identification number and almost all of the specifications in the January 29, 1975 contract that Hammoud supposedly arranged. Thus, the commission obligation incurred "in connection with" the January contract logically could refer to Rubaii's efforts on Federal's behalf.

Having determined that the guaranty contract's ambiguity created a jury issue, we address Lakewood's sufficiency of the evidence complaint. This court cannot overturn a jury verdict fairly supported by substantial evidence. *Mack v. Newton,* 737 F.2d 1343, 1350 (5th Cir.1984). We also recognize that contracts should not be construed to provide third party benefits unless it "clearly appears" that the parties

---

2. If Rubaii had established personal jurisdiction over his tort claims, he could have made at least a plausible argument that the court should have accepted jurisdiction over the breach of contract

action arising from the same facts. *See Nelson v. R. Greenspan & Co., Inc.,* 613 F.Supp. 342, 346 (E.D.Mo.1985).

intended to do so. *Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503–04 (Tex.1975).

■ Rubaii provided ample evidence of his services to Federal. In fact, there is little dispute about Rubaii's role until the first trip to Iraq, its aftermath, and Mohammed Hammoud's appearance on the scene. Given the similarities between the information in Rubaii's communications to Federal and the final contract, however, the jury was entitled to reject Lakewood's implausible explanation that it (1) meant to benefit Mohammed Hammoud, the rival broker; and (2) fulfilled its brokerage commission obligation under the guaranty contract by providing a $101,000 letter of credit to Hammoud, for which Lakewood could offer no documentation beyond its own in-house invoice. Further, Federal's former vice president testified that Federal's president had asked Lakewood for money to pay an unnamed agent in Florida; the jury could have interpreted this as a reference to Rubaii.

■ Finally, Lakewood argues that the district court improperly excluded testimony about Lakewood's lack of subjective intent to benefit Rubaii or TCS in entering the guaranty contract. We reject the argument because Lakewood can demonstrate no prejudice from this exclusion. *See* Fed. R.Civ.P. 61; *Pregeant v. Pan Am. World Airways, Inc.*, 762 F.2d 1245, 1248 (5th Cir.1985). Lakewood's president and former general manager, as well as Federal's former vice president, all testified that they either thought the brokerage commissions were destined for Hammoud, or that they had never heard of Rubaii, TCS or the Arab Bureau.

### C.

Lakewood also claims that the district court erred in using the Federal–Rubaii brokerage contract's eighteen percent annual late payment rate to calculate prejudgment interest due Rubaii under the Federal–Lakewood guaranty contract. Lakewood says the six percent Texas statutory rate should apply. Tex.Rev.Civ.Stat. Ann. art. 5069–1.03 (Vernon 1987); *see Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex.1988). The district court concluded that the contract rate of eighteen percent applied, reasoning that "the case was tried and went to the jury on the theory that" Lakewood would be liable for all damages under the Federal–Rubaii agency contract if the jury found Rubaii to be a third party beneficiary of the Federal–Lakewood guaranty contract. We conclude that the district court erred in applying the contractual rate instead of the statutory rate.

Rubaii's recovery is predicated on a theory that he was a third party beneficiary to the Federal–Lakewood contract. Lakewood never expressly assumed Federal's entire obligation to pay the Rubaii agency commission under the Federal–Rubaii contract.

■ Under a guaranty contract, the principal's liability measures the guarantor's liability unless the guarantor expressly limits his obligation. *See Hopkins v. First Nat'l Bank*, 551 S.W.2d 343, 345 (Tex.1977); *McKnight v. Virginia Mirror Co.*, 463 S.W.2d 428 (Tex.1971). In the recital and clause 1(b), the Federal–Lakewood guaranty contract referred only to "brokerage commissions"; this wording expressly limits Lakewood's obligation to that component of the Federal–Rubaii contract. This undertaking does not include interest owed by Federal in the event of default to Rubaii.

### III.

In sum, we conclude that the Texas wrong court savings statute applied to stop the clock in this case, thus defeating Lakewood's statute of limitations defense. We also find no error in the jury's conclusion that the Federal–Lakewood guaranty contract created third party beneficiary status for Rubaii, thus entitling him to payment from Lakewood. We remand, however, so that the district court can recalculate prejudgment interest at Texas' six percent statutory rate. The district court's judgment is

AFFIRMED in part, REVERSED in part and REMANDED.