**MIDWEST FINANCIAL ACCEPTANCE CORPORATION, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

No. 99–CV–6363L.

United States District Court, W.D. New York.

April 17, 2000.

Timothy Patrick Sheehan, John M. Himmelberg, Jr., Rochester, NY, for Midwest Financial Acceptance Corporation, plaintiff.

Michael E. Ferdman, Hiscock & Barclay, Buffalo, NY, for Federal Deposit Insurance Corporation, defendant.

### DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Midwest Financial Assistance Corporation ("Midwest"), commenced this action on August 18, 1999, against defendant Federal Deposit Insurance Corporation ("FDIC"). Midwest alleges that FDIC has breached a contract with Midwest by refusing to repurchase a loan that Midwest purchased from FDIC in 1998. Jurisdiction is premised on 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b), which provides that all civil suits in which FDIC is a party shall be deemed to arise under the laws of the United States. Both sides have moved for summary judgment.

### BACKGROUND

The facts are relatively straightforward and not in dispute. On September 30, 1998, Midwest entered into an agreement ("the Agreement") with FDIC, pursuant to which Midwest agreed to purchase from FDIC a loan that FDIC had made to Pedro and Belen Nieves in 1990. Section 16 of the Agreement set forth certain conditions under which Midwest could require FDIC to repurchase the loan:

***Repurchases at Buyer's Option:*** The Buyer may, at any time within sixty (60) days of the Closing Date, require the Seller to repurchase a Loan in the event that, prior to the Closing date:

16.1 The debtor had been discharged in a no asset bankruptcy proceeding and no collateral exists out of which the debt may be satisfied and all guarantors or sureties of the Note, if any, or the obligations

contained therein, have similarly been discharged in no asset bankruptcies;

16.2 A court of competent jurisdiction had entered a final judgment holding that neither the debtor nor any guarantors or sureties owes an enforceable obligation to pay the holder of the Note or its assignee(s); or

16.3 The Former Bank or the Seller had executed and delivered to the debtor a release of liability from all obligations under the Note.

16.4 Loans described in Section 1.19(e) of this Agreement (Contract for Deed) at any time within one (1) year of the Closing Date, if a title defect exists in connection with the property, which is the subject of the Contract for Deed and which title defect requires a prior order or judgment of a court to enable Purchase to convey title to such property in accordance with the terms and conditions set forth in the Contract for Deed.

Complaint Ex. A. The Agreement further provides that if Midwest sought repurchase of a loan, Midwest would have to "supply Seller with evidence satisfactory to Seller that the same constitutes a Loan subject to repurchase." *Id.* It also states that the "Agreement shall be controlled by Federal Law," but that "[t]o the extent not controlled by federal law, this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas." Complaint Ex. A § 37.

On January 23, 1998, the Nieveses filed for relief under Chapter 7 of the United States Bankruptcy Code. On May 28, 1998, the United States Bankruptcy Court for the District of Connecticut issued a discharge in that proceeding releasing them from all dischargeable debts.

In a letter dated November 11, 1998, Midwest informed FDIC that Midwest was exercising its right to require FDIC to repurchase the loan based upon the Nieveses' Chapter 7 discharge. FDIC responded by letter dated December 7, 1998, asking Midwest to furnish FDIC with evidence that the repurchase conditions set forth in § 16.1 of the Agreement had been fully met. In a letter dated December 19, 1998, Midwest replied that its repurchase request was not based upon § 16.1, but on § 16.2.

The parties' positions have not changed since that time. FDIC has refused to repurchase the loan, on the ground that § 16.2 does not apply to this situation, and that the conditions of § 16.1 have not been met because the Nieveses' bankruptcy proceeding was not a "no asset" proceeding. Midwest concedes that it has no repurchase right under § 16.1, since the Nieveses' bankruptcy proceedings were not "no asset" bankruptcies, but contends that § 16.2 does apply, because the Bankruptcy Court discharged the Nieveses' obligations under the loan.

Several other facts concerning the Nieveses' bankruptcy proceeding are relevant here. On February 26, 1999, Midwest filed a proof of claim in the Chapter 7 proceeding, stating that it possessed a secured claim against the Nieveses. Midwest placed the value of the collateral at $16,779. In a Distribution Report dated September 3, 1999, the Chapter 7 Trustee proposed a distribution of $10,097.22 to several of the Nieveses' creditors, including a distribution of $6,952.40 to Midwest.

In addition to their Chapter 7 proceeding, on July 7, 1998, the Nieveses filed for relief under Chapter 13 of the Bankruptcy Code. In this proceeding, the Chapter 13 Trustee filed a proof of claim on behalf of Midwest in the amount of $71,158, $16,779 of which was secured, and the remainder unsecured. Midwest filed a notice of appearance in the Chapter 13 proceeding on November 10, 1998. In an order dated November 10, 1998, United States Bankruptcy Judge Robert L. Krechevsky found that the value of certain real estate owned by the Nieveses was $82,000, and that

Midwest had secured and unsecured claims in the amounts stated by the Chapter 13 Trustee.

In a "Second Chapter 13 Plan" also dated November 10, 1998, the Nieveses agreed to pay to the Trustee the sum of $2295 per month for sixty months. Pursuant to this plan, the Trustee was to make certain disbursements to the Nieveses' creditors, including Midwest. On that same date, the Bankruptcy Court confirmed this plan, which requires the Nieveses to pay Midwest $16,779 with 8% interest, over a five-year period. As of November 15, 1999, $4428.17 had been paid to Midwest pursuant to this plan.

## DISCUSSION

### I. Summary Judgment in Breach of Contract Actions

At the outset, I note that the statement in the Agreement that it is to be "controlled by Federal Law," but that "[t]o the extent not controlled by federal law," the Agreement "shall be governed by and construed and enforced in accordance with the laws of the State of Texas," is hardly a model of clarity. If the Agreement is "controlled" by federal law, then it is difficult to see in what respect it could not be controlled by federal law. The most reasonable interpretation of this provision, however, would seem to be that to the extent that federal law does not speak to some aspect of the contract's meaning, the court should apply Texas law. At any rate, this does not present a problem in the instant case, since both federal and Texas law appear to be in accord on all relevant issues in this case, and neither party contends that one or the other should control, or that the outcome would be different under either one. See *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir.1993) ("Because state law provides the richest source of law of contract interpretation, we have incorporated state law principles in the process of developing a body of federal common law"). I will therefore look both

to Texas and federal law in analyzing the contract.

■■■ "When a case involves the interpretation of a contract and the contract is unambiguous, summary judgment is appropriate." *Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 544 (Tex.App.1999). This is so because "interpretation of an unambiguous contract is a question of law." *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1413 (5th Cir. 1993); *accord Hanssen v. Qantas Airways Ltd.*, 904 F.2d 267, 269 (5th Cir.1990); *Texas Commerce Bank N.A. v. National Royalty Corp.*, 799 F.2d 1081, 1083 (5th Cir.1986). If the only issue to be determined is the meaning of an unambiguous contract, then, logically there can be no issues of fact that would otherwise preclude summary judgment.

■■■ Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered into. *National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *CBI*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 393. A Texas court will deem a contract unambiguous when it is reasonably open to just one interpretation given the rules of interpretation and the surrounding circumstances. *Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc.*, 861 F.2d 1357, 1362 (5th Cir.1988).

■■■ If a contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, however, the contract is ambiguous, which creates an issue as to the parties' intent. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 517–18, 243 S.W.2d 154 (1951); *see also CBI*, 907 S.W.2d at 520. An ambiguity does not arise, though, sim-

ply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be reasonable. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *CBI*, 907 S.W.2d at 520; *Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977).

As stated, the federal common law of contract interpretation is in accord with these principles. *See, e.g., Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 178 (1st Cir.1995) (in construing the terms of contracts that are governed by federal common law, the court is guided by "common-sense canons of contract interpretation," including the canon that unambiguous terms are giving their plain and natural meaning); *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir.1989) (under federal common law of contracts, an agreement is not unambiguous if "reasonable people could find its terms susceptible to more than one interpretation").

## II. Interpretation of the Contract at Issue

Having reviewed the Agreement at issue in this case, I find that it is unambiguous, and that FDIC's construction of it is correct. Midwest's proposed construction would render § 16.1 superfluous, and is therefore unreasonable.

In support of its position, Midwest relies heavily on the Agreement's use of the word "or" separating the subsections of § 16. Midwest contends that this disjunctive term indicates that the subsections provide alternative bases upon which Midwest could demand that FDIC repurchase the loan, and that the fact that § 16.1 does

not apply does not mean that Midwest cannot rely instead on § 16.2.

As a general proposition, that is perfectly reasonable, but it misses the point. FDIC does not dispute that all Midwest has to do is show that any one of the subsections of § 16 applies. The issue is simply whether § 16.2 does apply, as Midwest claims.

Midwest's reasoning is that: the Bankruptcy Court is a court of competent jurisdiction; its order discharging the Nieveses is a final judgment; and the effect of that judgment is to discharge the Nieveses of any enforceable obligation to pay the holder of the note. If § 16.2 is read without reference to the other parts of § 16, that reasoning might have some appeal. The problem, however, is that when § 16.2 is read in context, Midwest's interpretation would, as stated, render § 16.1 superfluous. If Midwest's construction of § 16 .2 were correct, then any time the conditions of § 16.1 were met, the conditions of § 16.2 would necessarily be met as well. There would thus be no reason to have added § 16.1 in the first place.

■ Midwest's position, then, runs afoul of well-established rules of contract construction. "[C]ontract clauses should not be construed so as to render them superfluous unless absolutely necessary." *R.H. Sanders Corp. v. Haves*, 541 S.W.2d 262, 265 (Tex.Civ.App.1976). *See also Fort Worth Lloyds Ins. Co. v. Willham*, 406 S.W.2d 76, 79 (Tex.Civ.App.1966) ("courts are without authority to needlessly reject any words or terms used in contracts by the parties or delete any clause therein as surplusage, unless such action is judicially mandatory") (cited in *Tennessee Gas Pipeline Co. v. F.E.R.C.*, 17 F.3d 98, 105 (5th Cir.1994)).

In Midwest's attorney's reply affidavit,[1] he states that § 16 .1 is not superfluous,

---

1. FDIC states in its reply brief that this reply affidavit contains numerous legal conclusions and argument rather than factual matters within the affiant's personal knowledge, and

that those portions of the affidavit should be stricken by the court. Although much of the reply affidavit does contain legal argument more suitable for a memorandum of law rath-

**332**

because by its terms it applies to no-asset bankruptcies, and that "Section 16.2 just as clearly applies to bankruptcies in which assets exist, as well as to any other case in which a court of competent jurisdiction holds that the debtor does not owe an enforceable obligation." Affidavit of John M. Himmelberg, Jr. (Docket Item 15) ¶ 20. Midwest has not explained, however, why § 16.2 would not apply to no-asset bankruptcies as well under Midwest's construction. Whether assets exist or not, a bankruptcy discharge would fit within Midwest's interpretation of § 16.2, and there would be no need for § 16.1.

■ I agree with FDIC, therefore, that when read in context, § 16.2 appears to be directed more specifically to cases in which a court has held that the particular note in question is not enforceable. Such a judgment might be based, for example, on a finding of fraud in the inducement or incompetency on the part of the debtors at the time that they signed the note. In other words, it is not enough that a court has determined that all of the obligor's debts have been discharged. Section 16.2 appears to envision a situation in which a court has specifically found the note in question to be unenforceable, for whatever reason.

■ Again, when § 16.2 is read out of context, this construction may not be inescapable or obvious. In construing a contract, however, the court must consider the document as a whole, and give effect to the intentions of the parties as expressed in all the contractual provisions. *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, 76 F.3d 89, 91 (5th Cir.1996) ("Courts must read all provisions of an agreement together, interpreting the agreement so as to give each provision its intended effect. We must be particularly wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole") (citation omitted);

*Heritage Resources, Inc. v. Nationsbank,* 939 S.W.2d 118, 121 (Tex.1996) (in construing contract, court must "examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined"); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995) ("To [effectuate the parties' intent, courts] must read all parts of a contract together. Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract") (citations omitted); *K3 Enterprises v. McDaniel,* 8 S.W.3d 455, 458 (Tex.App. 2000) ("Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered"), *petition for review filed,* (Feb. 25, 2000); *Allied Chem. Corp. v. American Indep. Oil Co.,* 623 S.W.2d 760, 763 (Tex.App.1981) ("To take a word or a phrase or, as in this instance, an entire paragraph out of context from the content of the entire instrument can distort the true intentions of the parties").

■ In addition, the fact that § 16.1 is expressly directed toward a particular type of bankruptcy proceeding and discharge, under a particular set of circumstances, suggests that other types of bankruptcy discharges do not give rise to repurchase rights. Another well-established principle of contract construction is that "[s]pecific terms of a contract will control over more general terms ...." *Apex Financial Corp. v. Brown,* 7 S.W.3d 820, 826 (Tex.App. 1999); *accord AT & T Corp. v. Rylander,* 2 S.W.3d 546, 560 (Tex.App.1999). Since § 16.1 sets forth a very specific set of circumstances under which a discharge in bankruptcy will give rise to repurchase rights, I believe that it is reasonable to infer that other types of bankruptcy dis-

er than an affidavit, I will deny FDIC's request. Midwest's motion did indicate an intent to file reply papers, and FDIC is no more

prejudiced because Midwest's reply is in the form of an affidavit rather than a brief.

charges were not intended to be covered by the broader language of § 16.2.

■ As for Midwest's suggestion that this dispute over § 16.2's meaning should be construed against FDIC, which drafted the Agreement, I note that "[t]he rule of construing a contract against its drafter ... does not apply if the contract is unambiguous." *GTE Mobilnet of South Texas Ltd. Partnership v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 290 (Tex.App.1997). *See Forest Oil Corp. v. Strata Energy, Inc.,* 929 F.2d 1039, 1041 (5th Cir.1991) ("a contract generally is construed against its drafter only as a last resort under Texas law-*i.e.,* after the application of ordinary rules of construction leave a reasonable doubt as to its interpretation") (citing *Smith v. Davis,* 453 S.W.2d 340, 344 (Tex. Civ.App.1970)).

I also agree with FDIC that even if a bankruptcy discharge could satisfy the prerequisites of § 16.2, the Nieveses' discharge did not. As pointed out by FDIC in its memorandum of law, in *Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), the Supreme Court stated that a debtor's discharge from personal obligations in a Chapter 7 proceeding does not extinguish the "enforceable obligation" on a secured debt:

> Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor.

> \* \* \* \* \* \*

> [A] bankruptcy discharge extinguishes only one mode of enforcing a claim-

namely, an action against the debtor *in personam*-while leaving intact another-namely, an action against the debtor *in rem* .

■ Thus, the Bankruptcy Court's Chapter 7 discharge of the Nieveses' personal liability for their debts did not amount to a judgment that there was no longer any "enforceable obligation" on anyone's part to pay the holder of the note or its assignees, as required by § 16.2. The judgment here simply relieved the Nieveses of their own personal liability.

This point is further illustrated by the fact that pursuant to the Nieveses' Chapter 13 plan, Midwest has received monthly payments on its secured claim. That the claim was not fully secured, and that Midwest may therefore never recover the full amount of the debt owed to it, does not mean that the debt is unenforceable. Section 16.2 clearly envisions a situation in which a court has held that the note simply cannot be enforced, thus rendering it worthless. That is not what occurred here.

I find, therefore, that the conditions of none of the subsections of § 16 were fully met here, and that as a result, Midwest had no right to force FDIC to repurchase the loan. Accordingly, I grant FDIC's motion for summary judgment, and deny Midwest's motion.

## CONCLUSION

Plaintiff's Motion for Summary Judgment (Docket Item 7) is denied. Defendant's Cross–Motion for Summary Judgment (Docket Item 13) is granted, and the complaint is dismissed.

IT IS SO ORDERED.