## SOUTHERN MINERALS CORPORATION v. SIMMONS et al.

### No. 9183.

Circuit Court of Appeals, Fifth Circuit.

April 25, 1940.

Rehearing Denied June 11, 1940.

HUTCHESON, Circuit Judge, dissenting.

Birge Holt, of Corpus Christi, Tex., Dan Moody, of Austin, Tex., and Ralph R. Wood, of Houston, Tex., for appellant.

B. D. Tarlton and Dean B. Kirkham, both of Corpus Christi, Tex., for appellees.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant Southern Minerals Corporation (herein called Southern) sought unsuccessfully in the court below to enjoin appellees Jay Simmons and J. E. Webb from producing and disposing of gas from a well drilled by them on a tract of 333 acres in Nueces County, Texas, known as the Harrell Lease; or alternatively to exercise an option to acquire the well by paying its cost with an account of the gas

heretofore produced by appellees. The appellant and the appellees claim under Houston Oil Company of Texas (herein called Houston), which owned an oil and gas lease from Harrell dated March 24, 1930, covering the tract in controversy and reserving a ⅛ royalty on all oil and gas produced. Houston Oil Company owned other leases also, and on April 5, 1932, by a duly recorded deed to Southern Alkali Corporation in consideration of $177,750 did bargain, sell, transfer and assign all of the rights, title and interest of Houston Oil Company in named leases aggregating about 1300 acres and including the Harrell Lease, "in so far as the same cover gas rights * * * together with three certain gas wells, now completed thereon"; but "subject to the following specific understanding and agreement, viz: Should Southern Alkali Corporation, or its assigns, as a result of its operations on said leases, or either of same, discover oil in any well drilled on said lands, said Southern Alkali Corporation agrees to set casing in said well and make a thorough and workmanlike test thereof with a view to bringing in an oil well. Should said well when completed produce as much as fifty barrels of oil per day for ten consecutive days, the Houston Oil Company may at its option within forty days after completion take over and own said well by paying to Southern Alkali Corporation the cost actually incurred in drilling and equipping said well, exclusive of overhead charges. The Southern Alkali Corporation shall settle with holders of royalties and overriding royalties on oil that may be produced from any oil well drilled by it on the premises and not taken over by Houston Oil Company under the terms hereof. Should Houston Oil Company as a result of its operations discover gas in any well drilled on said land by Houston Oil Company in an unsuccessful effort to complete a commercial oil well, the said Houston Oil Company agrees to complete said well as a gas well; and should said well when completed produce merchantable gas in marketable quantities, the Southern Alkali Corporation may, at its option, within forty days after the completion, take over and own said gas well by paying Houston Oil Company the cost actually incurred in drilling and equipping said gas well, exclusive of any overhead charges and exclusive of any drilling costs below the producing horizon, provided, however, that it is distinctly understood and agreed that the Hous-

ton Oil Company shall not have the right or privilege of completing more than five such gas wells. The Houston Oil Company shall settle with holders of royalties and overriding royalties on any gas that may be produced from any gas well drilled by it on the premises and not taken over by Southern Alkali Corporation under the terms hereof."

The Southern Alkali Corporation in 1933 assigned its rights to appellant; expressly subject to the operating agreements between the owners of the gas rights and the owners of oil and oil rights, which were referred to and incorporated by reference. On Jan. 6, 1938, Houston Oil Company, in consideration of an additional royalty of ⅛ of the oil saved, and of the drilling of successive wells until all that are allowed by the Railroad Commission shall be drilled, did "bargain, sell, transfer and assign, subject to the performance of the obligations hereby imposed, unto Jay Simmons and J. E. Webb, their heirs and assigns, all of its rights under the said existing leases, (including the Harrell Lease and part of another), in so far as the same cover a 13/16 working interest in the oil rights. * * * It is the intention of first party that this assignment of the oil rights shall assign to the second parties *all of the rights under the original oil and gas leases* except the rights of the Southern Alkali Corporation and Southern Minerals Corporation as evidenced by the contract and assignment of gas rights of April 5, 1932 * * * recorded in Vol. 12, page 340, of Oil and Gas Records of Nueces County, Texas, to which instrument and *all of the terms thereof* reference is hereby made as if same were *fully copied herein.*" Emphasis is ours.

Simmons and Webb completed the well here in question about July 5, 1938. It produced quantities of gas, but "wet gas," so that by a simple process of condensation 150 or more barrels per day of liquid can be obtained from it. They promptly called attention of Southern Minerals Corporation to the well, saying they were uncertain whether it was an oil or a gas well, and offered it to Southern for cost. The court below found, and on conflicting evidence was justified in finding, that the offer was in relation to the option set forth in the deed of April 5, 1932. Southern refused the well, saying it "had more gas than Carter had oats." Simmons and Webb then contracted to sell the gas, after re-

moval of the liquids from it, and put in pipe lines and equipment for the purpose. Thereupon, on Aug. 12, 1938, Southern filed suit in a State court to stop Simmons and Webb from producing and selling the gas, but making no offer to take over and pay for the well under the option. Simmons and Webb answered, contending it was an oil well. That case was not tried, but the present similar suit was filed in the District Court of the United States. By amendment and as an alternative relief it was first prayed on Nov. 18, 1938, that the option of Southern to take over the well be enforced.

It is well settled that in the exercise of options the time limited is generally of the essence of the contract. Campbell v. Fetty, 5 Cir., 271 F. 671, 17 C.J.S., Contracts, page 1072, § 504. Especially is this true when a thing so uncertain and fluctuating as a new gas well is the subject of the option. 17 C.J.S., Contracts, page 1071, § 504. The option to take over this well, which was limited to forty days from its completion, could not be exercised four months after its completion. It is unnecessary to enquire whether the further finding of the district court was correct, that the option right was waived by Southern and the waiver was converted into an estoppel because Simmons and Webb made contracts and substantial expenditures on the faith of Southern's statement that it did not wish the well.

But it is said that the failure or refusal of Southern to take and pay for the well did not forfeit its ownership of the gas in place tapped by the well nor authorize Simmons and Webb, who owned only oil rights, to produce and sell the gas. To this Simmons and Webb make two replies: first, that the well is an oil well and the gas that is sold is produced inseparably from their oil; and second, that if this is a gas well under the agreement of April 5, 1932, the true meaning of the agreement is that Houston should have the product of a gas well drilled by it if Southern did not take it over, and that Simmons and Webb stand in Houston's shoes as assignees of its rights. Much of the record is taken up with expert testimony as to what the product of this well was in the earth at the pressure and temperature obtaining there, and whether the liquid separated out after production is oil; and the briefs make a question whether the well is to be classed as an oil or a gas well according to what it taps in the earth or what it produces at the surface. We enter on no discussion of these matters because it is unnecessary to decide them. We will assume that this is not a well "producing as much as fifty barrels of oil per day," but is a well "producing merchantable gas in marketable quantities," as described in the working agreement. There is also a contention in argument that it was not a well "drilled in an unsuccessful effort to complete an oil well," because some oil sands were penetrated before the gas strata were reached. The evidence is that the drilling was continued beyond the gas strata in a search for oil still lower, when the drill was twisted off in the hole. This fairly shows a well unsuccessfully sunk in search of oil. Southern's State court suit, and also that before us, alleged that Simmons and Webb completed the well "in an unsuccessful effort to produce oil." This being true, the second part of the working agreement, assuming for the present that Simmons and Webb are privy to it, required that the well be completed by them as a gas well and gave Southern, being also privy, an option for forty days to take it over at cost. This Southern did not do. The fair meaning of the agreement is that thereupon the well so required to be completed as a gas well shall be owned and operated as such by the driller. This is clear from the concluding provision that the royalties on gas from a well not taken over shall be paid by the driller. There would be no royalties without production, and the royalties are justly paid by him who owns the production. There is an exact parallel provided when the owner of the gas rights, searching for gas, strikes oil. He too must complete the well and permit the owner of the oil rights to take the well at cost within forty days; but if the well is not taken over may operate it, paying the royalties on the oil. The original oil and gas leases required the lessees to explore for oil and gas. When Houston and Southern sought to separate the ownership of oil from gas, instead of leaving the matter in such shape that if one in drilling reached the other's product, he would have to plug the well and lose the drilling cost, the agreement was made that the well should be completed, with a right in the other to pay for it and take it over. The intention was that if not taken over the completed well should remain the well of the driller, with the right to have whatever it would produce, paying the royal-

ties on the product. A construction which would require the driller to complete the well for the other party to make his choice to take or reject it, and if he rejected it then to plug the well and lose it, would be too unfair to have been in contemplation.

But it is contended that only Houston could thus acquire a gas well, and it could acquire only five on the whole 1,300 acres in which the gas rights were transferred to Southern. It is pointed out that the right so to acquire oil wells not taken was given Southern Alkali Corporation *or its assigns*; but assigns are not mentioned in the parallel provision about gas wells; and it is queried, How many of the five rejected gas wells can Simmons and Webb acquire as assignees of only 333 acres? It is evident that on April 5, 1932, when the deed from Houston to Southern Alkali Corporation was made, the latter intended to assign its rights, as it soon did, and its assigns were mentioned. It is probable that Houston did not then contemplate assigning any of its retained oil rights, and no mention was made of its assigns. But there was no personal trust or service or independent activity contemplated on the one side more than on the other. The working agreement between the owners of the oil rights and the owners of the gas rights was part and parcel of the separation of the two sorts of rights, and was intended to be and remain mutual. It was part of the deed which defined those rights, and in its nature as a property right was assignable, 6 C.J.S., Assignments, page 1054, § 8, 4 Am.Jur. Assignments § 17, 18; and indeed without express assignment as a covenant running with the lands it followed them into the hands of others. 14 Am.Jur.Covenants, § 19, 20, 25. Like the covenants in an ordinary lease affecting the property demised, this mutual covenant ran with all subdivisions of the property. It is characteristic of covenants which run with land that they may, even at common law, be apportioned as often and as far as the land is subdivided. 15 C.J.Covenants, § 58, 80; 14 Am.Jur., Covenants, § 19. And it was the plain intent of Houston to impart to Simmons and Webb all its own rights as to wells drilled on the leases assigned to them. The assignment required them to drill all the wells the Railroad Commission would permit, reporting each to Houston. Houston was to do no further drilling. Houston assigned all its oil rights

under the named leases except its reserved royalty and what had been assigned to Southern Alkali Corporation. We do not stand wholly on the point that the working agreement would have passed as appurtenant to the assigned oil rights without special mention, because it is expressly stated in the assignment that Houston intended thereby to assign *all of its rights under the original oil and gas leases except* the rights of Southern Alkali Corporation under the agreement of April 5, 1932, which agreement and *all the terms thereof* were referred to as if copied. The working agreement was thus written into the assignment to Simmons and Webb, and in so far as it applied to the assigned leases all Houston's rights under it were fully transferred to them. Houston retained no right to acquire any rejected gas well on that land drilled by Simmons and Webb. They were, so far as Southern was concerned, drilling for and in the stead of Houston, and with the same correlative rights and options. No one ever suggested anything else until late in this litigation. Houston has made no contrary claim. The limitation to five of the rejected gas wells that may be thus acquired and operated is of no importance now, for this is only the second such well. It is no concern of Southern on which lease or leases the first five occur. When five have been acquired, no others can be.

The decree refusing to enjoin the operation of the well in dispute, and refusing now to permit it to be taken over at cost was right and is affirmed.

HUTCHESON, Circuit Judge (dissenting).

I agree with the majority that if appellees stand in Houston's shoes, that is, if they are Houston's assignees as to the gas covenant Alkali made with Houston, Southern having failed to exercise its option, cannot lay claim to the well or its product and the judgment must be affirmed. I do not agree with them that appellees so stand. The controlling terms of Houston's assignment to appellees made on January 6, 1938, six years after Houston had assigned its gas and gas rights to Southern Alkali, are these: "Whereas first party *is the owner of the oil rights under an oil and gas lease from Harrell and wife, to Kelly * * *; and whereas first party is the owner of the oil rights under an oil and gas lease from Lawrence and wife to*

*Harrell and Harrell to Kelly;* * * * and whereas it is the intention of this instrument for first part to assign to second *parties the oil rights under said existing leases insofar as they cover a portion of the above described lots, in consideration of the drilling of certain wells and the payment of the overriding royalty as herein provided.* * * Houston Oil Company * * * does hereby bargain, sell, transfer and assign, subject to the performance of the obligations herein imposed, unto Jay Simmons and J. E. Webb, their heirs and assigns, *all of its rights under said existing leases insofar as same cover a* $^{13}\!/_{16}$ *working interest in the oil rights in and to, lots 23, 24 and 27, except the East 20 thereof, lot 20 and part of lot 13;* * * * *it is understood that it is the intention of first party that this assignment of the oil rights shall assign to second parties all of the rights under the original oil and gas leases, except the rights of the Southern Alkali Corporation and/or the Southern Minerals Corporation, as evidenced by the contract and assignment of gas rights of April 5, 1932* * * * to which instrument and all of the terms thereof, reference is hereby made as if same were fully copied herein. Second parties by the acceptance hereof agree for themselves, to commence within 10 days of such acceptance, drilling operations * * * and continue drilling the premises herein assigned with no more than 30 days elapsing in the completion of one and commencing of another well, until the premises are completely drilled, upon penalty of forfeiture for failure to drill as agreed." It was further provided: *"As further consideration for this assignment, the Houston Oil Company reserves an overriding royalty of* $^{1}\!/_{8}$ *in oil, that is* $^{1}\!/_{8}$ *of* $^{8}\!/_{8}$ *of the value or proceeds of the oil which shall be actually produced."* (Emphasis mine).

Not only in the granting clause of this assignment but throughout, the thing assigned is declared to be, *the oil rights under the Harrell lease.* Nowhere in the assignment is there a reference to gas rights of any kind. It is quite plain, therefore, that the parties had in mind, transferring not gas but oil rights, and that if appellees took any gas rights by Houston's assignment to them, it must be because the assignment in addition to transferring the oil rights Houston had under its leases, must be construed as transferring Houston's rights in and to Alkali's gas covenant with it. I think it plain that, read the instrument of assignment as you will, there may not be found in it any language having this effect. It first declares: that Houston *is the owner of oil rights* and that the purpose of the *instrument is to assign the oil rights;* then the granting clause provides that Houston bargains, sells, transfers and assigns all of its rights under existing leases insofar as same cover a $^{13}\!/_{16}$ working interest *in the oil rights,* in and to, five lots out of the Harrell leases; and finally in the last clause on which appellees put their main reliance it is stated: It is understood that it is the intention of *first party that this assignment of the oil rights,* shall assign to second parties, all of the rights under the original oil and gas leases except the rights of the Southern Alkali Corporation as evidenced by the contract and assignment of gas rights of April 5, 1932, and that instrument is referred to as if the same were fully copied. (Emphasis mine).

It is appellees' position that the reference in this clause to the contract between Houston and Southern has the effect to extend the assignment beyond its intention and granting clauses, and, in addition to transferring all the oil rights Houston Oil Company had under its oil and gas leases, it transferred to Simmons and Webb, the gas rights granted it by Southern's covenant that it might complete and own five gas wells, unless Southern pay the cost of their drilling and equipping. The argument here is that from the assignment of gas and gas rights to Southern Alkali, Houston Oil reserved the gas rights in and to the gas from five wells, if and when completed as the covenant provides; that Southern's rights in such gas are derived not from the assignment but from its payment of the well costs within the forty days the covenant provided for; and that these gas rights, being reserved by the Houston Oil Company from the assignment, passed to appellees, as to the particular tract conveyed, under this language in the final clause of intent, "all of the rights under the original oil and gas leases except the rights of Southern Alkali," notwithstanding that the granting clause and the instrument as a whole shows an intention to convey and conveys only Houston's rights in oil.

Appellant's argument against this is twofold: (1) that what is conveyed is determined and controlled by the granting clause, that mere expressions of intent

will not enlarge the grant, and that if such expressions could do so, they are absent here, the assignment over and over re-iterating its intention to convey oil rights. (2) The only purpose and effect of the reference to Southern's contract was to call to Simmons and Webb's notice that Houston Oil Company was assigning the oil rights subject to its covenant with Southern, that Southern might drill, complete, produce and own the oil from oil wells brought in by it unless, as provided in the covenant, the cost of drilling and equipping such wells was within the forty days provided therein, repaid to Southern. There was no occasion for a reference, there was no reference, to the gas rights granted Houston Oil by Southern, for the assignment to Simmons and Webb was limited to conveying oil rights. Besides the right to drill and own the gas was limited to five wells on the whole 1300 acres, more or less, and it could not be supposed that Houston was conveying to Simmons and Webb, the right to drill all the five wells provided for in the covenant. If, on the other hand, the contention is that the assignment was a partial one, giving Simmons and Webb a right to drill gas wells in the proportion that the acreage they took bore to the whole 1,300 acres, this contention must be rejected as not supported by any words appropriate to that purpose. In short, appellant insists that not only is the grant limited by express language to a grant of oil rights, and resort must be had to a forced construction to include in it, gas rights, but such a contention will not be permitted, for, derogating from Houston's rights under the covenant, no intent to assign will be inferred in the absence of clear and definite language carrying that intent.

I agree with appellant. I think it plain that the assignment from Houston to Southern conveyed all Houston's gas and gas rights under the leases, reserving none of it. The covenant with Southern for the gas in the five wells Houston might drill was a covenant for title upon condition. By it, Southern covenanted that Houston might complete up to five gas wells on the whole property and upon the condition that Southern did not pay for them within the forty days provided, Houston should own them and the gas they produced. The assignment to appellees neither refers to nor in any manner affects this covenant. Houston still owns the rights under it;

appellees are not Houston's successors, they are strangers to it. This would be clear enough I think from the language of the instrument, even if Houston had sold to appellees its oil rights under all the land covered by the gas assignment to Southern. The fact that appellees' assignment covers less than ¼ of the whole land affected by the covenant and that the covenant is coupled with a limitation to five wells on the whole of the lands involved, makes it even clearer that Houston did not intend to and did not transfer its rights under the covenant as a whole, and there is not a word in the assignment to show an intent to treat the covenant as divisible. Cf. Cosden Oil Co. v. Scarborough, 5 Cir., 55 F.2d 634, and convey it in part.

With the covenant standing so limited, I think it quite plain that though Houston could have assigned it partially and Southern could not have complained because such an assignment neither increased nor diminished its rights, *Houston will not be assumed to have done it, and thus to have diminished its own right in the absence of clear language showing that it was its intention to do so.* The rule of partial assignment is very simple and well settled as a reference to Standard Textbooks, 4 American Jurisprudence, p. 279, 281; American Law Institute, Re-Statement Contracts, Sec. 156; 6 C.J.S., Assignments, pages 1087, 1088, §§ 38, 39, 40, shows. This rule is, that a partial assignment was not valid at common law because, among other things, of the fact that it might subject the obligor to many actions. In equity, because of its more liberal procedure, a partial assignment was valid. Houston could therefore have made either a complete or a partial assignment of this covenant. But the question is, did it? It is not even contended that it made a complete assignment and the authorities make it clear that a partial assignment will not be found absent a clear expression of intent to so assign, especially where such an assignment would be to the prejudice of the assignor.

It is perfectly plain here, that Houston would take nothing by an assignment of its gas covenant to Simmons, for Houston reserved no gas royalties upon any gas wells that Simmons might drill. The only royalties Houston reserved were overriding oil royalties. In these *circumstances to imply an assignment against Houston is to take something from it, its right to drill*

*and own gas wells, directly in the teeth of the language of the assignment, that oil rights were being conveyed, and give it nothing in return.* I think it clear, therefore, that the conclusion that Houston transferred its interests in the gas contract under the gas covenant to Simmons and Webb, either in whole or in part, is in short, a strained and unreal one and without support in the evidence, and that our holding should be that Webb and Simmons have no rights in or to the gas because they took none by the assignment; that the gas belongs to Southern and appellees must account for it. Such a holding will accord with the language of the assignment and with justice, by protecting Southern from the spoliation of its gas and Houston from the loss of its gas rights which as I read the instrument, it did not at all intend to and it did not, convey.

If this view is correct and I think it is, it follows that appellees have and have had, no interest in or right to, gas produced from the well in question and that the judgment founded on the conclusion that they have, may not stand. Appellees are the owners of the oil rights, they are not the owners of the gas rights. Having no ownership or interest in them they must close off the gas sands from which they are producing, cease to operate the well as a gas well, and account to appellant for the gas they have taken.

I respectfully dissent.