**REO INDUSTRIES, INC., Plaintiff–Appellant,**

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant–Appellee.**

No. 90–1660.

United States Court of Appeals, Fifth Circuit.

June 3, 1991.

Marshall Searcy, Sam Dalton, Locke, Purnell, Rain & Harrell, Dallas, Tex., Jody G. Sheets, Culton, Morgan, Britain & White, Amarillo, Tex., for plaintiff-appellant.

Dennis M. Dylewski, Mark A. Bukaty, Daniel R. Cabianca, Calvin, Dylewski, Gibbs, Maddox & Verner, Houston, Tex., Jerome Mrowca, Asst. Gen. Counsel, Mid-Con Corp., Lobard, Ill., for defendant-appellee.

Before BROWN, SMITH, and WEINER, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

REO Industries appeals from summary judgment for Natural Gas Pipeline (NGPL) in this action for declaratory judgment and damages for the alleged breach of an operating agreement. REO complains that NGPL has breached the agreement governing rights to produce oil and gas by interfering with its right to produce gas. Federal jurisdiction is based on diversity, and Texas law is applied. The dispute centers on the interpretation of the contract, and so we review, as with any question of law, *de novo* on appeal from summary judgment. Finding no genuine issues of material fact and no legal error, we affirm.

### Here's What Happened

REO owns oil rights, and NGPL owns gas rights on the same 640 acres in the West Panhandle field.[1] They are successors to the parties to a 1933 operating agreement governing oil and gas development activities on the subject property and other properties.[2] The agreement specifies

---

1. The parties have stipulated to this ownership scheme. Documents in this record, which may be incomplete on the point since ownership of the oil rights is not disputed, suggest that REO owns less than all the oil rights (*i.e.,* only limited farm-out rights; *see infra,* note 2) or did when this controversy arose.

Separate ownership of the oil rights and gas rights in the same tract of land is common in the Texas Panhandle. This separation of rights is known as "phase severance." *See, e.g., Amarillo Oil Co. v. Energy-Agri Prod.,* 794 S.W.2d 20, 21 (Tex.1990); Note, *Phase Severance of Gas Rights from Oil Rights,* 63 Tex.L.Rev. 133, 133–37 (1984).

2. In 1935, Sinclair Prairie Oil Company, the successor to a 1926 oil and gas lease on the subject acreage known as the "Troutman Property," separated the oil and gas rights by assigning the gas rights under the lease to Texoma Natural Gas Company. The assignment incorporated by reference a 1933 Operating Agreement that had been concluded between the same parties to govern their activities as oil operator and gas operator on other specified properties with severed oil and gas rights. NGPL is the successor to Texoma's gas rights. Maynard Oil Company succeeded to Sinclair's oil and casinghead gas rights.

REO drilled the well at issue here pursuant to a November 21, 1984 farm-out lease in which

procedures to be followed when, in drilling, the oil operator finds gas or the gas operator finds oil.[3]

The one drilling the well may offer the well to the other, who is not obligated to buy. If tender is made and the option to purchase is exercised, the price is to be determined in part by a joint production test. If the option is not exercised, the drilling party retains his well and "its pro-

duction," and must pay the royalties on such production. *See infra*, note 5.

NGPL and its predecessor (Texoma), as gas operators have been producing gas from a well on the land since 1935.[4]

In 1985, REO drilled a well designated Troutman No. 1, seeking oil but finding gas. Paragraphs V and VII of the contract address this situation.[5] Paragraph V ap-

Maynard agreed to assign 25 percent of its interest in its oil rights to REO. On June 5, 1985 Maynard assigned to REO an undivided 25 percent of its interest "INSOFAR AND ONLY INSOFAR as said lease covers rights ... in the ... well [at issue in this case]," reserving for Maynard an overriding royalty interest. On April 15, 1986, Maynard assigned to REO *all* its interest in the lease "INSOFAR AND ONLY INSOFAR as said lease covers rights ... in [the same] well." The latter assignment was made effective November 19, 1985, and included rights under any contracts or agreements related to the lease.

3. Operating agreements such as the one at issue here are designed to anticipate problems that might arise due to the separate ownership. A significant problem can arise when one operator drills but encounters the other's product. Without an agreement, the operator could not produce the other's product and might not be able to recover its drilling costs. To encourage continued development of the lease through drilling and production, avoiding possible termination of the lease or delay rentals or shut-in royalties resulting under standard oil and gas leases in the absence of production, and protecting both operators from such wasteful and harsh results, such agreements provide ways for the unsuccessful operator to recover his drilling costs by selling such a well or producing from it.

For instance, the court in *Southern Minerals Corp. v. Simmons*, 111 F.2d 333 (5th Cir.), *cert. denied*, 311 U.S. 688, 61 S.Ct. 66, 85 L.Ed. 445 (1940) wrote, "When [the parties] sought to separate the ownership of oil from gas, instead of leaving the matter in such shape that if one in drilling reached the other's product, he would have to plug the well and lose the drilling cost, the agreement was made that the well should be completed, with a right in the other to pay for it and take it over. *Id.* at 336. *See also, e.g., Guffey v. Stroud*, 16 S.W.2d 527 (Tex.Comm'n. App.1929, opinion adopted) (adjudication of rights where oil lessee produced gas and no operating agreement was involved).

4. A well designated Troutman 1–SP produced from 1935–1963, and was replaced by Troutman R–1–SP, which has been producing since 1963.

5. Paragraphs V and VII provide:

[V]

In event the Oil Operator while drilling for oil shall encounter gas and does not elect to continue drilling to a greater depth in search for oil, or drills deeper in search for oil but does not find it, then and in either such event, and if and when the well upon its completion as a gas well shows on joint production test a capacity to produce at a rate of more than three million (3,000,000) cubic feet of gas per day, the Gas Operator shall have the option to purchase such well (*but it shall not be required to do so* ) at the net cost thereof including necessary equipment to the formation from which such gas is being produced, (net cost to include Fifty Dollars ($50.00) per month for overhead and supervision while drilling), except that the Gas Operator shall not be required to reimburse the Oil Operator *in an amount greater than the usual and ordinary costs of drilling and equipping such wells in the vicinity.* Within twenty (20) days after Oil Operator has completed such a gas well, it shall tender in writing, by registered mail, such well to the Gas Operator; together with an estimated itemized statement of such net cost thereof. After receipt of such tender the Gas Operator shall have ten (10) days, during which time it shall notify Oil Operator of its election to purchase or of its rejection to purchase such well. In event the Gas Operator elects to purchase said gas well, it shall pay to Oil Operator such net cost as above set forth within twenty (20) days from and after receipt of the final itemized statement, including the actual cost in place of any new material or the reasonable cash value of same if second hand. *However, should Gas Operator fail within said ten (10) days to notify Oil Operator of its election to so purchase said gas well, then Oil Operator shall own said well and have the right, subject to the limitations herein named, to operate such well* (but it shall not be required to do so unless indispensable to prevent cancellation of the lease, and shall not be required to do so in any event if there be no available market for the product) *for its own use and benefit. In the event Oil Operator operates such gas well, it shall pay to the lessor, his heirs or assigns, the gas rental or royalty provided for in the lease upon which said well is located.*

plies when a joint production test on a gas well shows capacity to produce more than 3,000,000 cubic feet of gas per day, and Paragraph VII applies to gas wells showing an open flow volume of 3,000,000 or less cubic feet per day. Under Paragraph V, the oil operator must offer the gas well to the gas operator at the net cost of the well, and under Paragraph VII the well is to be offered at half its cost.

For our purposes, the significant provisions of Paragraph V are as follows:

"[T]he Gas Operator shall have the option to purchase such well, (*but it shall not be required to do so*).... [S]hould Gas Operator fail within said ten (10) days to notify Oil Operator of its election to so purchase said gas well, then Oil Operator shall own said well and have the right, subject to the limitations herein named, to operate such well ... for its own use and benefit. In the event Oil Operator operates such gas well, it shall pay to the lessor, his heirs or assigns, the

gas rental or royalty provided for in the lease upon which said well is located."

The language of Paragraph VII is similar, providing that "[i]f the party entitled to purchase said well" does not, then "the party drilling the well shall own said well and the production therefrom, and shall have the right to operate such well for its own use and benefit...."

REO offered the well to NGPL (by letter dated August 6, 1985 and received September 9, 1985). NGPL declined to participate in a joint production test or to purchase the well, stating that "Natural [NGPL] is satisfied with the performance of its existing gas well on the section and, as long as Natural continues to produce its existing gas well, no one can legally operate the referenced well as a gas well under current Railroad Commission regulations." The Texas Railroad Commission's Rule 38 [6] and the appropriate field rules permit only one gas well on 640 acres, so the well is useless to NGPL (and to REO) unless NGPL plugs

[VII]
In the event Oil Operator, in drilling for oil shall bring in a gas well with an open flow volume at the rate of three million (3,000,000) or less cubic feet per day, or the Gas Operator, in drilling for gas, shall encounter oil production in a well of twenty-five (25) barrels, or less, per day on a ten (10) days' consecutive test, and the party drilling such well does not elect to continue drilling deeper in search of its own product, or does so without finding it, then such drilling party shall notify the other party, in writing, within ten (10) days after the end of the production test, and enclose an itemized estimated statement of the cost of drilling such well and information as to its production and formation, whereupon the other party shall have the right and option *(but it is not required to do so)*, at any time within ten (10) days from the receipt of such written notice, to take over such well by paying one-half (½) of the cost thereof under the same terms and conditions as set out in Paragraphs IV* and V above, whichever may be applicable thereto. *If the party entitled to purchase said well as aforesaid does not desire and elect to take over such well by paying one-half (½) of the cost thereof, the party drilling the well shall own said well and the production therefrom, and shall have the right to operate such well for its own use and benefit, subject to the limitations herein contained,* (but is not required to do so unless indispensable to prevent cancellation of the lease, and shall not be required to do so in any event if there be no available market for the product).

(Emphasis added; * Paragraph IV applies to oil wells drilled by the gas producer.)

6. Tex.Admin.Code, tit. 16, § 3.38 (1988 & 1990–91 West Supp.) [hereafter cited as 16 TAC § xx (19xx)]. The section in effect in 1985 provided: "No well shall be drilled on less, but may be drilled on more, acreage than that required for a standard proration unit as established in the applicable rules for any oil, gas, or geothermal resource field except as provided in this section." *Id.* § 3.38(a)(1) (1988) (effective January 1, 1976). The current language, *id.* at § 3.38(b)(1) (1990–91 Supp.), is similar: "No well shall be drilled on substandard acreage except as hereinafter provided."

Rule 38 is read in conjunction with the applicable field rules. Rule 3 of the Commission's special gas field rules applies to the West Panhandle Field: "[T]he standard proration unit, or acres to be assigned the well for gas allocation purposes, shall be six hundred forty (640) continuous and contiguous acres...." Railroad Commission of Texas, Oil and Gas Division, Oil and Gas Docket No. 108, Special Order No. 10–13,196, Adopting and Promulgating Field Rules to Apply to All Gas Wells Located in the West Sweet and West Sour Areas of the Panhandle Field, Rule 3(a), September 24, 1948. The currently effective language is similar: "[n]o gas proration unit shall contain less than six hundred forty (640) acres." Railroad Commission of Texas, Oil and Gas Division, Docket No. 10–87,017, Amended Final Order Adopting and Clarifying Rules and Regulations, March 20, 1989.

its pre-existing well or the Commission grants an exception to the rule. Exceptions to the Railroad Commission's rule are granted only to prevent waste or the confiscation of property.[7]

REO made a second offer to perform a joint production test and to sell its well, which was also refused. NGPL continued to operate its gas well. REO applied to the Commission for an exception, which NGPL opposed. The parties' arguments before the Commission focused on ownership of the gas reserves under the operating agreement as well as the questions of waste or confiscation of property. NGPL asserted that the Commission was the wrong forum since it lacked the legal power either to construe the contract or determine title to the gas.

Presumably bowing to the Commission's lack of primary jurisdiction, REO withdrew its application from the Commission and sued in state court seeking declaratory judgment and damages for NGPL's alleged interference with its operations in breach of Paragraphs II and XV of the operating agreement.

Paragraph II provides: "[I]t is further understood that each party shall so conduct its operations and so locate its improvements and equipment on said premises as to *interfere as little as possible with operations of the other.*" Paragraph XV further states: "Each party agrees ... to comply with all state and federal laws and *to protect any interest of the other party in such leases against liens or encumbrances caused by its acts or omissions....*" (Emphasis added.)

REO asserted that these provisions obligated NGPL not only to refrain from opposing REO's application to the Commission, but more significantly to either buy REO's well or plug its own well and forfeit all its rights under its gas lease in order to permit REO to operate its well under Rule 38.

NGPL moved for summary judgment after removing to federal court, claiming i) REO had not fulfilled conditions precedent imposed by the agreement; ii) NGPL was not obligated to buy the proffered well or plug its own well; iii) NGPL had not breached the agreement by opposing REO's Rule 38 application; iv) NGPL's conduct was not a proximate cause of any damage to REO; and v) REO's claims were not ripe for judicial determination.

REO filed cross motion for partial summary judgment on the issues of liability for and causation of damages,[8] claiming i) it had fulfilled the conditions precedent (or they were merely covenants); ii) NGPL was obligated to buy the well; iii) NGPL had interfered, in breach of Paragraphs II and XV of the contract, with REO's contractual right to operate the gas well by opposing REO's application for an exception and failing to plug its own well; and iv) NGPL's conduct proximately caused damages to REO.

The court granted NGPL's motion and dismissed REO's claim, determining that: i) NGPL did not breach the agreement because it did not require NGPL to refrain from opposing REO's application to the Commission and certainly did not impose the Hobson's choice either to buy REO's well or abandon its leasehold rights by plugging its own; ii) REO's claims were not ripe because REO had shown no injury; and iii) even if there was an injury, NGPL's conduct was not the cause of any damages to REO. The trial court denied REO's motion for reconsideration and new trial.

### No Title

 Texas has adopted the theory of ownership of oil and gas in place, beneath

---

7. "The commission, in order to prevent waste or ... to prevent the confiscation of property, may grant exceptions to the density provisions...." 16 TAC § 3.38(a)(4) (1988) (effective January 1, 1976). The same language appears in the current version of Rule 38 at 16 TAC § 3.38(f) (1988 & 1990–91 Supp.).

8. The motion for partial summary judgment reserved for trial the remaining issues of the amount of damages and attorneys' fees.

the surface of the land.[9] Under Texas law, oil or gas in place, beneath the surface, is part of the realty,[10] and becomes personalty upon production and severance.[11] Generally, a Texas oil or gas lease operates not as an ordinary lease, but as a deed or conveyance of a determinable fee simple estate, investing the lessee with title either to the oil or the gas, or both, in place.[12]

■ It is undisputed that NGPL is the record title holder of gas rights under an oil and gas lease and thereby owns the gas under the subject acreage. But REO argues that upon NGPL's election not to purchase the well, the Operating Agreement transferred to REO title to all the gas its well *"could produce,"* with the consequence that NGPL forfeits all its pre-existing, exclusive rights to the gas reserves under the acreage. This ownership by implied transfer is the basis of REO's claim that NGPL interfered with REO's operations, in breach of the agreement, by failing either to refrain from opposing REO's application for an exception to Rule 38 or to plug its own well.

REO sought as damages the amount of money it could have earned if NGPL had not interfered with its right to operate the well. REO has not, and cannot, claim that NGPL has converted gas belonging to REO by continuing to produce gas from NGPL's pre-existing well.

Nonetheless, since the parties have agreed that in this field one well can produce all the gas under the 640 acres, REO essentially contends that by failing to purchase a well it does not need, NGPL has forfeited the entirety of its exclusive rights to gas under its lease on this acreage.

Since, despite REO's lamentations, it has to be uncontradicted that no gas—whoever owns it—can be produced from REO's well without a Rule 38 exception, REO's other claims are of secondary importance to that of the claimed forfeiture of NGPL's exclusive ownership of all the gas in place under the acreage.

Construing a contract under Texas law, the following principles apply: Interpretation of an unambiguous contract is a question of law,[13] and the determination of whether a contract is ambiguous is also a question of law.[14] A contract is not ambiguous merely because the parties have a disagreement on the correct interpretation.[15] A contract is not ambiguous "when it is reasonably open to just one interpretation given the rules of construction and the surrounding circumstances."[16] Contracts are to be construed in their entirety to give effect to the intent of the parties,[17] considering each provision with reference to the entire contract, so that every clause has some effect and no clause is rendered meaningless.[18] A contract is given its plain grammatical meaning unless that meaning

**9.** *Ryan Consol. Petroleum Corp. v. Pickens,* 155 Tex. 221, 285 S.W.2d 201 (1955), *cert. denied,* 351 U.S. 933, 76 S.Ct. 790, 100 L.Ed. 1462 (1956).

**10.** *Texas Co. v. Daugherty,* 107 Tex. 226, 176 S.W. 717 (1915).

**11.** *Humble Oil & Ref. Co. v. West,* 508 S.W.2d 812 (Tex.1974).

**12.** *W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27 (1929).

**13.** *Technical Consultant Services, Inc. v. Lakewood Pipe,* 861 F.2d 1357, 1362 (5th Cir.1988) (citing *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 196 (Tex.1962)); *Kutka v. Temporaries, Inc.,* 568 F.Supp. 1527, 1534 (S.D.Tex.1983); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

**14.** *Deauville Corp. v. Federated Dep't Stores, Inc.,* 756 F.2d 1183, 1193 (5th Cir.1985) (applying Texas law); *Watkins v. Petro–Search, Inc.,* 689

F.2d 537, 538 (5th Cir.1982) (applying Texas law); *Kutka,* 568 F.Supp. at 1534; *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *Coker,* 650 S.W.2d at 394.

**15.** *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981).

**16.** *Technical Consultant,* 861 F.2d at 1362 (applying Texas law); *see also, Deauville,* 756 F.2d at 1193; *Watkins,* 689 F.2d at 538; *Kutka,* 568 F.Supp. at 1534; *Reilly,* 727 S.W.2d at 529; *Coker,* 650 S.W.2d at 393–94.

**17.** *Watkins,* 689 F.2d at 538 (citing *Sun Oil,* 626 S.W.2d at 727–28)); *Reilly,* 727 S.W.2d at 529; *Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.,* 662 S.W.2d 951, 953 (Tex.1983); *Coker,* 650 S.W.2d at 393.

**18.** *Deauville,* 756 F.2d at 1193; *Coker,* 650 S.W.2d at 393.

would defeat the intent of the parties.[19] And, of course, the interpretation of the writing should be undertaken "in the light of the circumstances" at the time the contract was executed.[20] Most significantly, Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way.[21]

We hold that summary judgment was appropriate here because the contract is unambiguous. We agree with the District Court that the correct interpretation of the writing in light of the circumstances giving rise to its confection and to avoid an unnecessary forfeiture is that, although technically REO owns its well and any gas *produced* by that well, since no gas can be produced without an exception to Railroad Commission Rule 38, REO owns no gas and no economic value has attached to REO's potential, technical right under the contract to gas it may abstractly produce.

REO asserts that we are bound by our 1940 decision in *Southern Minerals Corp. v. Simmons*[22] to hold in its favor.

We are, of course, bound by *stare decisis* to our legal holdings—in *Southern* a contract interpretation. Thus, we must interpret the same contract in the same manner. But, although the *Southern Minerals* contract also provided for the results when one operator found the other's product, it differed from the contract we interpret in several significant ways.

First, the *Southern Minerals* contract *required* the drilling party producing the other's product to *complete the well and offer it to the other*. The operating agreement here *permits* the operator to complete the well and offer it to the other. Because the oil operator was required to complete the well, the court in *Southern* said, "A construction *which would require the driller to complete the well* for the

other party to make his choice to take or reject it, and if he rejected it then to plug the well and lose it, would be too unfair to have been in contemplation."[23]

While in that case it "would be too unfair to have been in [the] contemplation" of the parties to *require* a drilling operator to complete a well that was not productive of the product for which it had rights, sinking additional funds and efforts into a well, with no potential benefit if the other chose not to buy, it is not, in this case, "too unfair to have been in [the] contemplation" of the parties to *permit* the operator to take such a risk in hopes of still making a return on his so-far unsuccessful well. It *is*, on the other hand, "too unfair to have been in contemplation" for NGPL as gas operator to be expected to purchase an unneeded gas well or forfeit all of its gas rights.

Second, REO points out that in *Southern Minerals*, the court relied in part on the agreement's "provision that the royalties on gas from a well not taken over" were to be paid by the party drilling the well. "There would be no royalties without *production*, and the royalties are justly paid by him who owns the *production*."[24]

Paragraph V of the operating agreement at issue here, *supra* note 5, provides that if an oil operator retains and operates a gas well under the paragraph, it is to pay the gas rental or royalties on its own production. Paragraph XII apportions taxes between the oil operator and the gas operator by providing that the gas operator shall pay all taxes upon the gas rights "excepting such taxes upon gas from and gas rights in *particular wells* which the Oil Operator under the provisions of this operating agreement may have acquired, which taxes the Oil Operator shall pay if sepa-

---

19. *Reilly,* 727 S.W.2d at 529.

20. *Technical Consultant,* 861 F.2d at 1362; *Deauville,* 756 F.2d at 1193; *Watkins,* 689 F.2d at 538; *Reilly,* 727 S.W.2d at 529; *Coker,* 650 S.W.2d at 394.

21. *Reilly,* 727 S.W.2d at 530; *Henshaw v. Texas Natural Resources Foundation,* 147 Tex. 436, 216 S.W.2d 566, 570 (1949).

22. 111 F.2d 333 (5th Cir.), *cert. denied,* 311 U.S. 688, 61 S.Ct. 66, 85 L.Ed. 445 (1940).

23. *Id.* at 336–37 (emphasis added).

24. *Id.* at 336 (emphasis added).

rately assessed or taxed, and, if not, then its fair and equitable apportionment thereof." (Emphasis added.)

REO says that these provisions are meaningless if not interpreted to mean that REO owns all the gas that *"could* be produced" from its well. But it is not meaningless to interpret the contract to mean that REO is to own all gas *actually* produced from the well.

No gas *can* legally be produced from REO's well because of Rule 38, and no royalties on that well's production are payable unless there is production. Thus, REO has never owned any gas and can owe no taxes based on ownership of the gas. The contract provisions are not rendered meaningless by our construction; the circumstances to which they apply simply have not arisen.

Further, the result produced is consistent with *Southern* and the language used by that court in declaring that the oil drilling party owned all the gas that "would be produced" from an individual well. There the parties were not limited by Railroad Commission proration rules to one gas well. The interpretation of the contract in *Southern* did not produce a forfeiture of all gas rights of the gas operator, as would be produced here under REO's construction. We do not and cannot find that the parties intended that the failure to exercise the option to pay for REO's gas well would result in NGPL's forfeiture of its exclusive leasehold gas rights.

Third, and perhaps most significantly, the opinion in *Southern* does not reflect that there was any legal impediment to the oil operator's ability to operate a gas well or receive its production. In the case at hand, NGPL *cannot have breached* the agreement by interfering with rights to

produce gas that, because of Rule 38, have never existed. Furthermore, NGPL's actions *cannot have caused* REO to lose rights that, because of Rule 38, have not come into existence.

### *No Breach*

■ We reject the contention that NGPL, by opposing REO's Rule 38 exemption petition to the Commission, breached the agreement. The trial court properly held that because the contract itself provides that it is subject to state and federal statutes and regulations (paragraph XX), and the Commission's rules require notice [25] and permit interested parties to appear at a hearing [26] prior to granting such an exception, there is no breach.

The Texas case REO cites [27] for the proposition that one may agree in a contract to refrain from exercising a legal right is not significant here. Unlike the explicit agreement in that case to refrain from exercising specific rights, NGPL's agreement in Paragraphs II and XV of the operating agreement not to interfere with REO's operations cannot reasonably be construed to constitute an agreement to refrain from exercising the right—if not the *duty* to prevent waste—granted by the Commission to oppose an exception.

We similarly reject REO's contention that the agreement's Paragraph II and XV non-interference provisions require NGPL to plug its well and forfeit its gas rights. The provisions cannot reasonably be so construed.

Although it is often said that implied contract provisions are generally not favored by Texas law,[28] they are regularly employed by Texas courts in construing oil and gas leases.[29] · Several factors are relevant in allowing a court to imply a covenant: First, it must appear from the ex-

---

**25.** 16 TAC § 3.38(a)(4) (1988) (effective January 1, 1976); *Id.* § 3.38(f) (1988 & 1990–91 Supp.).

**26.** *Id.* § 1.24 (1988) (effective January 1, 1976).

**27.** *Kennard v. McCray,* 648 S.W.2d 743, 745 (Tex.Ct.App.1983).

**28.** *Atlantic Richfield Co. v. Exxon Corp.,* 663 S.W.2d 858, 870 (Tex.Ct.App.1983), *rev'd on other grounds,* 678 S.W.2d 944 (Tex.1984); *Em-*

*mord's, Inc. v. Obermiller,* 526 S.W.2d 562, 565 (Tex.Civ.App.1975).

**29.** Certain specific implied covenants are recognized by Texas courts construing oil and gas leases. They are: "(1) to develop the premises, (2) to protect the leasehold, and (3) to manage and administer the lease." *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567 (Tex.1981) (oil company owed its lessor a duty to seek administrative relief).

press terms of the contract that the implied term was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, or the implied term must be indispensable to give effect to the intent of the parties as disclosed by the contract as a whole.[30]

Nothing in this contract warrants the implication proposed by REO—that NGPL must forfeit its gas leasehold rights, plug its well and refrain from opposing REO's application for a Rule 38 exception, in order to avoid interfering with REO's operations.

The trial court properly ignored as inconsequential the factual disputes regarding conditions precedent to NGPL's option to purchase REO's well. On our construction of the contract, this possible factual controversy did not raise a genuine issue of material fact.

### No Injury

■■■ REO complains that the District Court improperly deferred to the Railroad Commission "under the doctrine of primary jurisdiction." This is not an accurate depiction of the trial court's holding, which did not use the phrase "primary jurisdiction" and in no way deferred to the Railroad Commission. The court did state that the complaint was "not ripe" because without an exception to Rule 38, REO's well had no economic value. Since it had not lost anything of any economic value, *REO had not been injured.* The court simply decided that REO has lost nothing because it had nothing to lose; it had no gas and could lawfully deliver none.

The doctrine of primary jurisdiction, by contrast, is a doctrine of judicial abstention whereby a court which has jurisdiction over a matter, nonetheless defers to an administrative agency for an *initial decision* on questions of fact or law within the peculiar competence of the agency.[31]

Primary jurisdiction differs from exhaustion of administrative remedies and ripe-

---

*Cf. Sun Exploration and Production Co. v. Jackson,* 31 Tex.Sup.Ct.J. 604, 1988 WL 220582 (July 13, 1988) (implied covenant of further exploration of leased premises after securing production), withdrawn on motion for rehearing, 783 S.W.2d 202 (Tex.1989) (no implied covenant of further exploration exists independent of implied covenant of reasonable development); *Cabot Corp. v. Brown,* 754 S.W.2d 104, 106 (Tex.1987) (implied duty to "obtain the best price reasonably possible," rather than a fair or reasonable price); *Texas Oil and Gas Corp. v. Hagen,* 31 Tex.Sup.Ct.J. 140, 1987 WL 47847 (Dec. 15, 1987) (oil and gas lease imposes duty upon lessee to act as a reasonably prudent operator, but not a duty to act with "highest good faith" in marketing lessor's gas), opinion withdrawn [pursuant to parties' settlement agreement], 760 S.W.2d 960 (Tex.1988). Although the precise limits of these covenants may be uncertain, their purpose is to give effect to the intent of the parties in creating an oil and gas lease. The provisions REO contends should be implied are not of this nature.

**30.** *Fuller v. Phillips Petroleum Co.,* 872 F.2d 655, 658 (5th Cir.1989); *Kutka v. Temporaries, Inc.,* 568 F.Supp. 1527, 1535–36 (S.D.Tex.1983); *Danciger Oil & Ref. Co. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941); *Grimes v. Walsh & Watts, Inc.,* 649 S.W.2d 724, 727 (Tex.Ct.App. 1983); *Stalcup v. Eastham,* 330 S.W.2d 237, 240 (Tex.Civ.App.1959).

**31.** *See, e.g., Television Cable Service, Inc. v. Bryant,* 684 S.W.2d 196, 198–99 (Tex.Ct.App.

1984) (for discussion of primary jurisdiction as applied under Texas law).

For Federal purposes, the doctrine of primary jurisdiction is healthy and frequently used. *See, e.g., Southwestern Sugar & Molasses Co. v. River Terminals Corp.,* 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959) (affirming primary jurisdiction reference to ICC of tariff matter within agency's competence, 253 F.2d 922 (5th Cir. 1958)); *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) (even though action existed at common law and statute authorized suit in federal district court or complaint before ICC, plaintiff must invoke redress through ICC which had power to alter unreasonable rates in established schedules); *Huber Corp. v. Denman,* 367 F.2d 104, 111–12, 120–21 (5th Cir.1966) (directing reference, under doctrine of primary jurisdiction, to FPC to determine question of its own jurisdiction over matter *arguably* within jurisdiction of the commission); *Weymouth v. Colorado Interstate Gas Co.,* 367 F.2d 84, 101–03 (5th Cir.1966) (companion case to *Huber,* same); *Carter v. American Tel. & Tel. Co.,* 365 F.2d 486 (5th Cir.1966) (affirming primary jurisdiction reference to FCC of tariff validity in private antitrust action), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Mobil Oil Corp. v. FPC,* 463 F.2d 256, 265–66 (D.C.Cir.1971) (on review of FPC orders following primary jurisdiction reference in *Huber,* reversing FPC's orders and approving court reference to commission under "broad and supple doctrine of primary jurisdiction"), *cert. denied sub nom Mobil*

ness in that those concepts determine the stage at which a court may review an administrative action.[32] No review of administrative action was sought here; REO had withdrawn its Rule 38 exception application and sought other relief in court.

A court, under Texas law, generally should defer under the doctrine of primary jurisdiction to an agency that has jurisdiction over a matter that is before the court.[33] But no question of primary jurisdiction was involved here. REO did not ask the court for resolution of any matter within the Railroad Commission's jurisdiction. Moreover, had it done so, its request would have properly been denied as judicially ineffectual.

■ REO correctly points out that the Railroad Commission does not have jurisdiction over the contractual dispute between REO and NGPL. The Railroad Commission has no authority to determine title to land or property rights.[34] It has no jurisdiction to award damages.[35] And it has no jurisdiction over the interpretation of contracts.[36]

Thus, the court was empowered to, and did properly decide the contract interpretation, title, and damages issues.

■ REO's request for damages to compensate it for the loss of the economic value of the well—lost potential profits—

simply goes out on the court's bottom line holding that REO had not yet suffered any cognizable injury, because the well was worthless "until and unless an exception to Rule 38 was obtained" to permit the flow of a single molecule of gas from the well. REO never had any exploitable economic interest in the potential production of the REO gas well even though the contract gives it the right to operate its well *subject to pertinent laws and regulations.* The operating agreement cannot grant REO the right to operate the well in the sense of authorizing actual production and delivery of the gas. That is controlled by valid Texas statutes and applicable proration regulations of the Railroad Commission.[37] Without a Rule 38 exemption, REO could not produce a molecule of gas.

What it could not legally do is no basis for a claim for lost profits, because no economic value ever attached to the well. Even if NGPL had not opposed REO's application for a Rule 38 exception and REO had not voluntarily withdrawn the application, there is no probative certainty that the Commission would have approved the exception. In fact, REO concedes that the possibility of an exception is remote. The parties do not contest that one well can drain all of the recoverable gas reserves beneath the acreage. Thus the court properly held that REO has not been injured.[38]

---

Oil Corp. v. Matzen, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972); Annotation, *The Doctrine of Primary Jurisdiction as Defined and Applied by the Supreme Court,* 38 L.Ed.2d 796.

**32.** *Television Cable Service,* 684 S.W.2d at 198–99 (quoting *D & S Investments, Inc. v. Mouer,* 521 S.W.2d 118 (Tex.Civ.App.1975), citing Davis, *Administrative Law Doctrines,* 28 Tex.L.Rev. 376, 400 (1950)); *see also, U.S. v. Western Pac. R.R. Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

**33.** *Penny v. Southwestern Bell Tel. Co.,* 906 F.2d 183, 187 (5th Cir.1990) (applying Texas law); *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411, 413 (1961); *Television Cable Service,* 684 S.W.2d at 199.

**34.** *Amarillo Oil Co. v. Energy–Agri Products, Inc.,* 794 S.W.2d 20, 26 (Tex.1990) (title to gas); *Railroad Comm'n v. City of Austin,* 524 S.W.2d 262, 268 (Tex.1975) (title to gas); *Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1965).

**35.** *Foree v. Crown Cent. Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968).

**36.** *Biskamp v. General Crude Oil Co.,* 452 S.W.2d 515, 517 (Tex.Civ.App.1970).

**37.** Tex.Nat.Res.Code Ann. § 81.051 (Vernon 1978).

**38.** Texas law denies recovery of potential profits where damages are uncertain or speculative. *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). Furthermore, because REO has alleged only a hypothetical injury, there may be no "case or controversy," and it is highly doubtful that REO has standing to sue for such damages in federal court. *Mideast Sys. and China Civil Constr. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1176 (D.C. Cir.1986).

### No Causation

■ REO's complaint that the District Court incorrectly decided the issue of causation can easily be disposed of.[39]

The District Court held that even if NGPL's actions breached the contract and even if REO suffered damages, REO's damages were not causally related to the breach. This was so because it was the voluntary withdrawal of its application for a Rule 38 exception that brought about the worthlessness of REO's gas well. Assuming, without deciding, the correctness of this conclusion, there is no probative certainty that the Commission would have approved REO's application for an exemption if NGPL had not opposed the application. Thus there was no clear causal link between NGPL's action and any injury. REO's contentions ignore this lack of a threshold causal link. Thus the court correctly decided that NGPL's actions were not the cause of any injury to REO.

### No Case

Therefore, because REO has shown no breach of contract, no injury, and no damages caused by NGPL's actions, the District Court is correct.

AFFIRMED.

---

**39.** The party complaining of a breach of contract carries the burden of proving that he suffered pecuniary loss *as a result* of the breach. *Copenhaver v. Berryman,* 602 S.W.2d 540, 543 (Tex.Civ.App.1980).